# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHOPIFY INC. AND SHOPIFY (USA), INC., <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> EXPRESS MOBILE, INC., <br><br> Defendant and Counterclaim Plaintiff. | Case No. 19-439-RGA |

**PLAINTIFFS AND COUNTERCLAIM DEFENDANTS SHOPIFY INC.
AND SHOPIFY (USA), INC.'S PROFFER OF FACTUAL TESTIMONY TO BE
PROVIDED BY PRIOR ARTIST, CAMERON BATEMAN**

Pursuant to the instructions provided by the Court during the status conference on January 28, 2022, Express Mobile deposed Mr. Cameron Bateman for the third time[1] on March 30, 2022.  Further to the Court's direction, Plaintiffs Shopify Inc. and Shopify (USA), Inc. ("Shopify") hereby proffer the following summary of factual testimony of Mr. Cameron Bateman that Shopify intends to offer at trial.  Shopify is informed and believes that if Mr. Bateman is called as a witness at trial, Mr. Bateman will testify consistent with the facts below, based on his personal knowledge.

This testimony is relevant and admissible, because it will provide additional context to the jury about the prior art and problems that Mr. Bateman was trying to solve, and the features and functionality of the product Mr. Bateman worked on.  This is particularly true here, where Express Mobile intends to provide testimony from two named inventors of the Asserted Patents[2] about the work they did, as is reflected in the Patents-in-Suit.[3]  Courts have routinely held that factual testimony from prior art inventors is relevant and admissible, because it provides the jury with additional context to consider as part of its determination of whether the asserted claims of

---

[1] Mr. Bateman was deposed by Express Mobile for the first time on September 9, 2020, during a deposition originally noticed by Shopify.  Subsequent to Shopify's deposition, Mr. Bateman was deposed by another party accused of infringement by Express Mobile, GoDaddy.com, LLC, in the case *Express Mobile, Inc. v. GoDaddy.com, LLC*, Case No. 19-10937-MFK (previously RGA).  Express Mobile had notice of and attended that deposition, and asked questions of Mr. Bateman at that deposition.

[2] U.S. Patent No. 9,063,755, U.S. Patent No. 9,471,287, and U.S. Patent No. 9,928,044.

[3] Express Mobile has stated that it intends to offer testimony from named inventor Mr. Steven Rempell as to "Knowledge of Express Mobile business operations and patent licensing practices; conception and reduction to practice of asserted patents; prosecution of asserted patents in USPTO; prior art."  Express Mobile's First Suppl. Initial Disclosures, at 2 (May 4, 2021). Express Mobile has stated that it also intends to offer testimony from named inventor Mr. Ken Brown on "Technology, conception, and reduction to practice of the '755, '287, and '044 Patents."  *Id.*

ME1 40406498v.1

the Asserted Patents are obvious.[4]

## I.   INTRODUCTION

1.      Mr. Bateman is a software engineer who was part of the team that developed the software product known as BlackBerrry MDS Studio.  *See, e.g.*, DTX081 & DTX111.  Shopify contends that BlackBerry MDS Studio renders the asserted claims of the '755, '287, and '044 patents obvious.  Mr. Bateman will testify that he was involved in the development of BlackBerry MDS Studio and will provide the jury with context about BlackBerry MDS Studio, including the features and functionality found in BlackBerry MDS Studio and its public release. Mr. Bateman will explain the key features of the systems and methods of BlackBerry MDS

---

[4] *See Knowles Elec., LLC v. Microtronic U.S., Inc.*, No. 99 C 4681, 2000 WL 310305, *2 (N.D. Ill. Mar. 24, 2000) ("an inventor's testimony concerning the design and mechanics of his particular contribution to the prior art may indeed aid the factfinder in determining the scope and meaning of the prior art"); *Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc.*, 602 F.3d 1325, 1339-40 (Fed. Cir. 2010) (affirming district court's decision to allow prior art inventor testimony based on personal knowledge); *CertusView Techs., LLC v. S&N Locating Servs., LLC,* No. 2:13cv346, 2016 WL 6915303, at *1 (E.D. Va., Mar. 7, 2016) (holding that prior art inventor could testify as a lay witness based on his personal knowledge); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 WL 1330002, at *3 (N.D. Cal. May 15, 2006) (same); *Gart v. Logitech, Inc.*, 254 F. Supp. 2d 1119, 1123 (C.D. Cal. 2003) (same). *Cf. also In re Google LLC*, No. 2021-170, 2021 WL 4427899, at *7 (Fed. Cir. Sept. 27, 2021) (rejecting the notion that prior art witnesses are irrelevant in the transfer analysis because they are allegedly unlikely to testify at trial); *In re Hulu, LLC*, No. 2021-142, 2021 WL 3278194, at *3 (Fed. Cir. Aug. 2, 2021) (same); *Innogenetics, NV*, 512 F.3d 1363 (Fed. Cir. 2008) ("Abbott also argues that there is no requirement that an expert opine on motivation to combine references, and that motivation can be established by other witnesses or the prior art. Abbott is correct that an expert is not the only source for evidence that it would be obvious for one skilled in the art to combine references to reach the claimed method."); *Voice Techs. Group, Inc. v. VMC Systems, Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) (in discussing patent-in-suit inventor testimony in the context of *Markman* "An inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims. The testimony of the inventor may also provide background information, including explanation of the problems that existed at the time the invention was made and the inventor's solution to these problems.").

Studio for mobile application development, and the public availability of those features and functionalities.

2.      Mr. Bateman's testimony will be helpful to the jury in understanding what features and functionalities existed in BlackBerry MDS Studio, which will provide the jury with facts to consider and compare with expected analogous testimony from at least two of the named inventors on the Asserted Patents.

3.      Express Mobile has not stipulated to the fact that BlackBerry MDS Studio is prior art to the Asserted Patents, *see* D.I. 324-1 at 2 (not including any facts relating to BlackBerry MDS Studio and its status as prior art), and Express Mobile has challenged on evidentiary grounds numerous documents relating to BlackBerry MDS Studio that describe the system.  *See* D.I. 324-8 at 3 (objecting to each document with a "BBSHOPEXPR" bates prefix as well as additional documents related to BlackBerry MDS Studio produced by Shopify).  Express Mobile also appears to take the position that certain documents do not describe features and functionalities included in the version of BlackBerry MDS Studio that Shopify is relying on as prior art.  *See generally*, questions asked by Express Mobile at Mr. Bateman's depositions regarding the version of BlackBerry MDS Studio.  Mr. Bateman's testimony is relevant to each of these issues.  He will testify as to facts from his personal knowledge as he worked on the development of BlackBerry MDS Studio for approximately two years.

## II.     MR. BATEMAN'S BACKGROUND[5]

4.      Mr. Bateman will identify himself as an individual residing in Alameda, California, who currently works at Oracle.  Mr. Bateman will testify that he has a Bachelor's

---

[5] Headings are provided for organizational purposes only.  They are not part of Mr. Bateman's proposed testimony.

degree in computer science from the University of Waterloo, which he received in 1999.  Mr.
Bateman will testify he was previously employed at Research in Motion, otherwise known as
"RIM" or "BlackBerry."  He will testify he worked at BlackBerry for about two years, from
approximately February 2004 to February 2006.  Mr. Bateman will testify that his position at
BlackBerry was a software engineer or software developer.  Mr. Bateman will testify that he
worked at BlackBerry in their Mississauga, Ontario, Canada office.  Mr. Bateman will testify
that for the entire time he worked at BlackBerry, he worked on the BlackBerry MDS Studio
project.

5.      Mr. Bateman will testify that he has no connection to Shopify.  He will testify that
he does not own any stock in Shopify.  He will testify that he has no connection to Express
Mobile.  He will testify that he is not being compensated for his time testifying.

III.    **BLACKBERRY MDS STUDIO GENERALLY**

6.      Mr. Bateman will identify himself as a person who worked on the product
produced by BlackBerry known as BlackBerry MDS Studio ("MDS Studio").  Mr. Bateman will
testify that MDS Studio is an integrated development environment, and the purpose of it was to
create mobile applications for BlackBerry devices.  Mr. Bateman will testify he understands how
the MDS Studio product operated because he worked on it and was involved in the creation of
the product.  Mr. Bateman will testify that he was involved in the design of the product.

7.      Mr. Bateman will testify that there were three components to the overall product:
1) the MDS Studio development environment; 2) a runtime environment for applications that
runs on a client's BlackBerry device; and 3) the application gateway.

8.      Mr. Bateman will testify that Chris Smith was a manager of the development team
that created the three components related to the MDS Studio (MDS Studio, the Runtime

ME1 40406498v.1

Environment, and the application gateway).  Mr. Bateman will testify Chris Smith took over the position from the previous manager in 2005.

9.      Mr. Bateman will testify that Bryan Goring was Mr. Bateman's technical team lead on MDS Studio.  Mr. Bateman will testify that Brindusa Fritsch led the team that built the application gateway product.

10.      Mr. Bateman will testify that Kamen Vitanov worked on MDS Studio.  Mr. Bateman will testify that Mr. Vitanov lead the team working on the runtime environment portion of the product.

11.      Mr. Bateman will testify that each of Chris Smith, Brindusa Fritsch, Bryan Goring, and Kamen Vitanov, and he worked on the version of MDS Studio released in 2005.[6]

12.      Mr. Bateman will testify that he understands the roles of these people with respect to the development of MDS Studio as he worked either directly or indirectly with each of them, and they all worked with Mr. Bateman in Mississauga, Ontario, Canada.

13.      Mr. Bateman will testify that MDS Studio was a powerful visual application design and assembly tool that allows for developers to quickly create rick client applications for Java-based BlackBerry devices.  Mr. Bateman will testify that MDS Studio allowed developers to quickly create mobile applications using drag and drop functionality.

14.      Mr. Bateman will testify that MDS Studio was an integrated development environment for use by a developer.  Mr. Bateman will testify that MDS Studio was a desktop application, used to compose applications by a combination of dragging and dropping components, declaring relationships between the components, and in some cases writing small

---

[6] All of the individuals referenced above are referred to in documents about which Mr. Bateman may testify and will provide the jury with additional context about the members of the MDS Studio team.

6

amounts of script to tie the application logic together.  Mr. Bateman will testify that the studio

tool would allow someone to author or create an application, and the application bundle that the

studio tool created could be downloaded to a BlackBerry device by the Runtime Environment.

15.     Mr. Bateman will testify that when he started at BlackBerry in February 2004,

MDS Studio was not yet released to the public and instead was a prototype.  Mr. Bateman will

testify that he worked on the first official version of MDS Studio released to the public.  Mr.

Bateman will testify he when he left BlackBerry, BlackBerry was on its second release of MDS

Studio.  Mr. Bateman will testify that MDS Studio had been released to the public as of March

23, 2006.  Mr. Bateman will testify that in 2006, he worked on demonstrations for BlackBerry

partners to show at conferences.

16.     Mr. Bateman will testify that he worked with a third party to integrate MDS

Studio with a Lotus Domino server, which was an email server in late 2005 or early 2006.  Mr.

Bateman will testify that the third party had MDS Studio available on its systems and likely

downloaded it from publicly-available sources prior to Mr. Bateman's work with the party.  Mr.

Bateman will testify that BlackBerry's relationship with this third party was commercial in

nature.

17.     Mr. Bateman will testify that internally, the first version of MDS Studio that he

worked on was referred to as version 1.0.  Mr. Bateman will testify that all of the features he

testifies to were found in MDS Studio denoted internally as version 1.0.  Mr. Bateman will

testify that if MDS Studio was marketed to the public as version 4.1 in 2005, that is the version

that he worked on and knew internally as version 1.0.  Mr. Bateman will testify that he believes

the "4.1" branding was included because BlackBerry wanted to show continuity in the market

with a separate product that used the name Mobile Data Services or possibly Mobile Data

System (what Mr. Bateman knew as "MDS").  Mr. Bateman will testify that BlackBerry wanted to put MDS Studio under MDS as part of a product suite.

18.     Mr. Bateman will testify that he understood it to be BlackBerry's regular business practice to release user guides for its products.  Mr. Bateman will testify that he has no reason to believe that BlackBerry did not release user guides for the version of MDS Studio that he worked on.

19.     Mr. Bateman will testify that there was a support forum for users of MDS Studio that he remembers visiting and using, including after he left BlackBerry.  Mr. Bateman will testify this forum was open to the public, including to him after he left BlackBerry.  Mr. Bateman will testify that this was a forum where members of the public who needed support relating to MDS Studio could go to ask questions of other members of the public or BlackBerry.

## IV.     MDS STUDIO APPLICATIONS

20.     Mr. Bateman will testify that MDS Studio facilitated the development of component-based applications, meaning that users could create a number of different types of components that could then be manipulated and used to create an application.  Mr. Bateman will testify that the use of components simplified the process of building an application so that users could often drag and drop components into the authoring tool (MDS Studio) and translate that into a working application on the device.

21.     Mr. Bateman will testify that MDS Studio included functionality for creating applications that included the structure for information sent to and received from a web service.  Mr. Bateman will testify that the applications were written primarily in XML, short for extensible markup language.  Mr. Bateman will testify that there was often script also included with the application files, although the main language was XML (the "XML application").

22.      Mr. Bateman will testify that XML was used in order to be able to define the application so that it could run on multiple different platforms without modifying the original application.  Mr. Bateman will testify that the applications created with MDS Studio were platform independent.  Mr. Bateman will testify that there were efforts and work done to ensure that the XML applications were built in a way that would allow them to run on non-BlackBerry devices.  Mr. Bateman will testify that MDS Studio was implemented in a way that would allow for creation of applications for non-BlackBerry devices.

23.      Mr. Bateman will testify that MDS Studio included application components such as screen components, data elements, and message components.  Mr. Bateman will testify that a screen component could be for example, a form to submit information, such as those commonly seen on webpages.  Mr. Bateman will testify that the screen component would consist of subcomponents which would include things such as text boxes that you could enter text into or buttons that you could press to make something happen.  Mr. Bateman will testify that a developer could construct the overall screen component by dragging and dropping those subcomponents onto a canvas provided by MDS Studio.

24.      Mr. Bateman will testify that MDS Studio also included message components. Mr. Bateman will testify that message components could be used to send messages to and receive messages from a web service.  Mr. Bateman will testify that MDS Studio used WSDL[7] as the description language for these messages.

25.      Mr. Bateman will testify that MDS Studio used WSDL documents to create applications.  Mr. Bateman will testify that these WSDL documents could be retrieved from

---

[7] WSDL stands for "Web Services Description Language," which is a standard that defines web services.  A WSDL file defines a specific web service.

third-party servers.  Mr. Bateman will testify that MDS Studio could also retrieve a WSDL file

that was locally stored on the machine running MDS Studio.  Mr. Bateman will testify that MDS

Studio included a feature, called a "wizard," that could take a WSDL document and, from that

document and based on what was found in that document, generate an application that could

interact with the web service.  Mr. Bateman will testify that this was one of the functionalities of

the "Quick Start" approach included in MDS Studio.

26.     Mr. Bateman will testify that MDS Studio would read the WSDL file describing a

web service and that the file contained the metadata describing each of the operations available

from that web service.  Mr. Bateman will testify that MDS Studio would analyze the expected

inputs and outputs of the web service that was defined in the WSDL in order to create an XML

application.  Mr. Bateman will testify that the developer could include functionality available

from the web service in the application.  Mr. Bateman will testify that MDS Studio would use

the information in the WSDL to create the screens based on the data about the inputs and outputs

to the web service and the functionality available.  Mr. Bateman will testify that MDS Studio

would use the metadata in the WSDL, which provided hints as to what should be the appropriate

interface, and mapping between screen components and message components.

27.     Mr. Bateman will testify that MDS Studio could have been used to, for example,

create an RSS reader application if there was a WSDL that defined an RSS reader.  Mr. Bateman

will testify that MDS Studio could also have been used to, for example, create a chat application

if there was a WSDL that defined the web service endpoints for a chat application.  Mr. Bateman

will testify that MDS Studio could be used to create an application to interact with any web

service defined in a WSDL document.

28.     Mr. Bateman will testify that message components included variables and their data types.  Mr. Bateman will testify that MDS Studio prevented developers from creating associations between message components and screen components if a variable in the message component had a data type that was not supported by the screen component.  Mr. Bateman will testify that for example, a variable with a Boolean data type could not be mapped to a text box.

29.     Mr. Bateman will testify that MDS Studio would generate default screens by examining the WSDL file and using the information in the WSDL file as "hints" as to what to use as screen components.  Mr. Bateman will testify that, for example, that if data in the WSDL file had the data type of "string," MDS Studio would create a text box based on that information.  Mr. Bateman will testify that, as another example, if a value for the data defined in the WSDL file was one that could only have three or four options that were acceptable, MDS Studio would generate a dropdown box.  Mr. Bateman will testify that MDS Studio had internal logic to decide which screen component should be used for a particular data type that was associated with data defined in a WSDL file for a given web service.  Mr. Bateman will testify that, for example, MDS Studio would not create a radio button for an input that required a string.  Mr. Bateman will testify that MDS Studio would create an XML application that would include preferred screen components for the web service in that MDS Studio would try to pick the appropriate screen component to use with the web service depending on the type of data that was expected, again based on the WSDL file.

30.     Mr. Bateman will testify that the XML applications created with MDS Studio could include functionality to access user data located on the device such as data from the user's calendar, contacts, or email.

ME1 40406498v.1

31.     Mr. Bateman will testify that MDS Studio stored applications in an application repository hosted on a server.  Mr. Bateman will testify that when the developer using MDS Studio was ready to ship their application or deploy their application for use on a device, MDS Studio would collect together the components that were created and that defined the application and create a bundle and upload that bundle to the application repository.

## V.     THE BLACKBERRY MDS RUNTIME ENVIRONMENT

32.     Mr. Bateman will testify that the Runtime Environment's purpose, at a high level, was to take artifacts generated by MDS Studio that Mr. Bateman worked on and construct that into a running application that a user could interact with on a device.  Mr. Bateman will testify that the Runtime Environment was essentially a software that ran on a BlackBerry device that could download the application that then ran on the device.  Mr. Bateman will testify that this Runtime Environment would execute the XML application on the device.

33.     Mr. Bateman will testify that the Runtime Environment was Java-based, and specifically, implemented in something called Java Micro Edition, which was a slimmed down version of Java that was designed to run on mobile devices.

34.     Mr. Bateman will testify that there were a variety of BlackBerry devices that existed in early 2006.  Mr. Bateman will testify that different Runtime Environments would need to be downloaded as appropriate for the specific device.  Mr. Bateman will testify that different BlackBerry devices required different Runtime Environments in order for applications developed using MDS Studio to work.

35.     Mr. Bateman will testify that the Runtime Environment was an add-on feature for a BlackBerry device and needed to be downloaded as it did not come pre-loaded on the device like other programs (e.g., operating system or email client) may have been.

36.     Mr. Bateman will testify that the XML application was also downloaded to the BlackBerry device.  Mr. Bateman will testify that a Runtime Environment on a BlackBerry device associated with an application repository server would display a list of available XML applications for download, and if an XML application was selected for download, the application would be downloaded from the server to the BlackBerry device.  Mr. Bateman will testify that this downloading would occur over the network.

37.     Mr. Bateman will testify that this XML application would be sent to a BlackBerry mobile device.  Mr. Bateman will testify that once the XML application was received by a device, it was loaded into memory by the Runtime Environment on the device.  Mr. Bateman will testify that the runtime would then render the XML application to present it on the device using the runtime.

38.     Mr. Bateman will testify that, for example if the XML application defined a form to input data, MDS Studio would have defined that form in XML, and then the runtime would load that XML and display it to the user of the device, in the form intended by the application developer.

39.     Mr. Bateman will testify that based on the structure defined in the XML application, the Runtime Environment would be able to make web service calls directly to web services over the Internet and perform functionalities defined by those web services.  Mr. Bateman will testify that the Runtime Environment was responsible for receiving the messages from a web service and interpreting the responses for display on the BlackBerry device.

## VI.    BLACKBERRY EXECUTABLE FILES

40.     Mr. Bateman will testify that the file setup.exe (DTX105) produced by BlackBerry in this litigation is a program ("the Executable Program") that he recognizes as the MDS Studio program he worked on.  Mr. Bateman will testify that he recognizes the

functionality present in the Executable Program as functionality present in the version of MDS Studio that he worked on. Mr. Bateman will testify that the aspects of the Executable Program he recognizes were all found in the version of the MDS Studio that he worked on.

41. Mr. Bateman will testify that he is familiar with the "Quick Start approach wizard", the "Bottom Up approach wizard" and the "Top Down approach wizard" present in MDS Studio, documents relating to MDS Studio, and in the Executable Program. Mr. Bateman will testify that each wizard was present in the version of MDS Studio that he worked on. Specifically, Mr. Bateman will testify that the Quick Start approach wizard functionality found in the Executable Program was present in the version of MDS Studio that he worked on.

42. Mr. Bateman will testify that through the Quick Start approach wizard, MDS Studio could create screens based on an analysis of a WSDL file, as discussed above, and as demonstrated through an example XML application created with the Executable Program. Mr. Bateman will testify that the functionality present in the Executable Program was also present the version of MDS Studio that he worked on.

43. Mr. Bateman will testify that the functionality of preventing an invalid message data type/screen component association (discussed above) was present in the version of MDS Studio that he worked on, and its operation is present in the Executable Program and discussed in documents relating to MDS Studio. Mr. Bateman will testify that this feature stopped developers from making mistakes.

44. Mr. Bateman will testify that MDS Studio included an application repository as shown in the Executable Program.

45.     Mr. Bateman will testify that the version of MDS Studio that he worked included functionality for analyzing WSDL documents in order to create an application, and similar functionality is present in the Executable Program.

46.     Mr. Bateman will testify that certain features in the Executable Program were part of the version of MDS Studio that was released to the public prior to January 2008.[8]

Dated:  April 29, 2022                          MCCARTER & ENGLISH, LLP

                                                */s/ Alexandra M. Joyce*
                                                Daniel M. Silver (#4758)
OF COUNSEL:                                     Alexandra M. Joyce (#6423)
Daralyn J. Durie                                Renaissance Centre
Adam R. Brausa                                  405 N. King St., 8th Fl.
Timothy C. Saulsbury                            Wilmington, DE 19801
Vera Ranieri                                    Tel: (302) 984-6331
Raghav R. Krishnapriyan                         dsilver@mccarter.com
Eric C. Wiener                                  ajoyce@mccarter.com
Annie A. Lee
DURIE TANGRI LLP                                *Attorneys for Plaintiffs and Counterclaim Defendants*
217 Leidesdorff Street                          *Shopify Inc. and Shopify (USA), Inc.*
San Francisco, CA 94111
Tel: (415) 362-6666
ddurie@durietangri.com
abrausa@durietangri.com
tsaulsbury@durietangri.com
vranieri@durietangri.com
rkrishnapriyan@durietangri.com
ewiener@durietangri.com

Whitney R. O'Byrne
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
Tel: (213) 992-4499
wobyrne@durietangri.com

---

[8] Shopify understands that the Court has precluded Mr. Bateman from discussing his patent that he testified is related to MDS Studio.  D.I. 343 (resolving D.I. 316 as stated at D.I. 342, pp. 77-89).  Shopify has therefore not included Mr. Bateman's proposed testimony on this topic, even though Mr. Bateman is familiar with, and would testify to, the disclosures in this patent if he were permitted to do so.

ME1 40406498v.1